**NORTH STAR ALASKA HOUSING CORPORATION, an Alaska corporation, Appellant,**

v.

**FAIRBANKS NORTH STAR BOROUGH BOARD OF EQUALIZATION, Appellee.**

No. S–2756.

Supreme Court of Alaska.

Aug. 4, 1989.

---

David H. Call, Call, Barrett & Burbank, Fairbanks, for appellant.

Mark Andrews, Asst. Borough Atty., Eugene P. Hardy, Borough Atty., Fairbanks, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

## I. INTRODUCTION.

North Star Alaska Housing Corporation ("North Star") appeals a superior court decision upholding a Fairbanks North Star Borough ("Borough") property valuation on grounds that it was improperly calculated. The valuation, calculated for tax purposes, was based upon North Star's property interests in certain land and buildings located on Fort Wainwright. North Star owns and operates rental units on land leased from the United States Government on Fort Wainwright. The land is leased to North Star free of charge, and is leased back to the United States Government, together with the rental units which North Star owns, for a rental and maintenance fee. The valuation was upheld by both the Borough Board of Equalization ("Board") and the superior court. North Star argues: 1) that its interest in this land cannot be taxed; 2) that the method used by the Borough to value the "leasehold" interest is improper; and 3) that the Borough's valuation of the buildings should be reduced to reflect the fact that the United States Government may in the future render them worthless by not renewing the 32-year lease for the land upon which they are situated.

## II. FACTS AND PROCEEDINGS.

On June 27, 1986, the United States Government leased approximately 76 acres of land on Fort Wainwright to North Star. The term of this lease (the "outlease") is 32 years. Also on June 27, 1986, the same parties entered into an "Agreement to Lease," which provides that North Star will construct and operate 400 residential family housing units on the leased land. The United States Government will pay $6,777,120 in "shelter" rent and $953,800 in "maintenance" rent annually for the use of the units, with the maintenance rent to be periodically adjusted for inflation. The term of this lease is 19½ years, commencing on the date that the buildings are completed. The outlease provides that during the term of the rental agreement (19½ years from date of completion), North Star will be allowed to operate its housing project on the Government's land free of any rental charge. Additionally, the rental agreement provides that the Government will pay for all utilities and fuel used by the residents. By the terms of this agree-

ment, North Star is to retain ownership of the 400 units.

In 1987 the Borough valued North Star's interests in the Fort Wainwright land and structures for tax purposes. The Borough valued North Star's interests at roughly $6.6 million. This figure represented a value of $2,814,754 attributed to North Star's leasehold interest in the land; $168,885 for its interest in the utilities on the land; and approximately $3.6 million[1] for its interest in the structures on the land. North Star appealed this valuation to the Board and the superior court without success. This appeal followed.[2]

North Star challenges the Borough's valuation of its property interests on three grounds. First, North Star contends that the Borough is prohibited by both federal and state law from assessing a tax on the land leased from the United States Government. North Star further argues that the valuation method used by the Borough in valuing its leasehold interest was "fundamentally wrong," and, thus, invalid. North Star also takes the position that the Borough was required to adjust its valuation of North Star's rental units based on the possibility that those structures might have an economic life which lasts only as long as the 32-year outlease.

## III. CAN THE BOROUGH TAX NORTH STAR'S LEASEHOLD INTEREST IN THE FORT WAINWRIGHT LAND?

■ Resolution of this question is controlled by our decision in *Ben Lomond, Inc. v. Fairbanks North Star Borough Board of Equalization*, 760 P.2d 508 (Alaska 1988). Arguments paralleling those made by North Star were expressly rejected in *Ben Lomond. Id.* at 509, 511, 513. There we ruled that the Borough could tax a developer's interest in land leased from, and leased back to, the United States Government. *Id.* at 511, 513.

The developer in *Ben Lomond* owned and operated rental housing on the leased land, just as North Star does here. *Id.* at 511. We held in that case that a tax on the developer's interest in the land was permissible under applicable federal and state law, and the Borough's own taxation ordinance. *Id.* at 513. We did not accept the developer's argument to the effect that its leasehold interest could not be taxed where the terms in the applicable leases deprived it of " 'the traditional rights of property ownership.' "[3] *Id.* at 511. Rather, we held that the developer's twenty-three-year leasehold interest was in substance a valu-

---

**1.** The record is unclear as to the exact assessed value of the rental structures. According to the assessment notice and North Star's brief, this interest was valued at $3,626,812. However, according to testimony before the Board, a member of the Borough Assessing Staff agreed with a Board member's statement that the structures were valued at $3,616,351. This is the figure presented by the Borough in its brief on appeal. Furthermore, with apparently no basis in the record, the Board, while affirming the Borough's total valuation of $6.6 million, attributed the figures of $3,145,000 and $3,455,000 to the land and structural interests, respectively. The Borough asserts that these latter figures merely constitute clerical errors.

Based upon the evidence presented, it appears that the Board's figures are the product of a clerical error. On remand the Board must redetermine what values it is attributing to the various interests. We note that the record supports the conclusion that the Borough values which were upheld by the Board are as follows: $2,814,754 for the interest in the land; $168,885 for the interest in the utilities; and $3,626,812 for the interest in the structures. On remand the parties may present evidence, and the Board

may alternatively decide upon substantial evidence, that the Borough valuations which were upheld are actually those included in the Board's findings, or those in the Borough's appellate brief.

**2.** In December of 1988 the Board moved to have the case remanded to the superior court in light of this court's recent decision in *Ben Lomond, Inc. v. Fairbanks North Star Borough Board of Equalization*, 760 P.2d 508 (Alaska 1988). This motion was denied.

**3.** As examples of such deprivation, North Star notes that 1) it is obligated to rent its units to military personnel; 2) it has no right to raise rent; 3) it cannot evict its tenants or foreclose on the property; 4) the government can evict North Star from the property upon a breach of a lease condition by North Star; and 5) North Star cannot prevent the Government from granting easements on the land. Several attributes of property ownership which North Star neglects to mention are 1) North Star's ability to construct rental units on the property, and charge rent; and 2) North Star's right to use the land at no cost.

able taxable interest. *Id.* at 511, 513.[4]

■ We conclude that North Star's leasehold interest is taxable. A taxing authority may look at the substance of a transaction to determine whether there exists a taxable interest. *Id.* at 511–12 n. 11 (citing *Sisters of Providence in Washington, Inc. v. Municipality of Anchorage,* 672 P.2d 446, 448 (Alaska 1983)). In the case at bar the outlease enabled North Star to construct and lease rental units for valuable consideration. Like the developer in *Ben Lomond,* North Star has a property interest in the Government land upon which the rental units have been constructed. As such, the Borough is permitted to tax this interest as "real property." [5]

We therefore affirm the superior court's affirmance of the Board's decision that North Star's leasehold interest is taxable.

## IV. IS THE METHOD USED BY THE BOROUGH TO VALUE NORTH STAR'S LEASEHOLD INTEREST IN THE FORT WAINWRIGHT LAND "FUNDAMENTALLY WRONG," AND THUS INVALID?

■ North Star challenges the Borough's decision to implement its tax ordinance by valuing the leasehold interest in the Fort Wainwright land according to what the parties term the "reversionary method," rather than by the allegedly appropriate "rent savings" method. This in-terest was valued by the Borough at $2,814,754. The reversionary method values property based upon its fee simple value, discounted by a factor representing the fact that the property will revert to the owner in the future. The rent savings method arrives at a value based upon the market rental value of the leasehold minus the amount of rent actually paid by the lessee.

North Star argues that the reversionary method used by the Borough to value its leasehold interest is violative of the Borough's own taxing ordinance, FNSB Ord. No. 3.08.029, and the state enabling statute, AS 29.45.110(a). North Star also argues that the rent savings method, the valuation method commonly used in condemnation proceedings, should be used for assessment purposes. Consequently, North Star concludes that the reversionary method used by the Borough is "fundamentally wrong."

State law requires that a property assessment be based on the property's "full and true value." AS 29.45.110(a). The term "full and true value" is defined as "the estimated price that the property would bring in the open market and under the then prevailing market conditions in a sale between [willing and knowledgeable parties]." AS 29.45.110(a). The Borough's taxing ordinance tracks AS 29.45.110(a). FNSB Ord. No. 3.08.029.[6] Taxing authori-

---

**4.** In *Ben Lomond,* 760 P.2d at 512–13, we also cited and relied upon *Offutt Housing Co. v. County of Sarpy,* 351 U.S. 253, 76 S.Ct. 814, 100 L.Ed. 1151 (1956); *Fort Dix Apartments Corp. v. Borough of Wrightstown,* 225 F.2d 473 (3d Cir. 1955), *cert. denied,* 351 U.S. 962, 76 S.Ct. 1024, 100 L.Ed. 1483 (1956); *Quintard Terrace Apartments, Inc. v. State,* 269 Ala. 136, 111 So.2d 602 (1959); *Brookley Manor, Inc. v. State,* 265 Ala. 141, 90 So.2d 161 (1956); *Gay v. Jemison,* 52 So.2d 137 (Fla.1951); *Meade Heights, Inc. v. State Tax Comm'n,* 202 Md. 20, 95 A.2d 280 (Md.1953); *State v. Personnel Housing, Inc.,* 300 S.W.2d 506 (Mo.1957); *Bragg Inv. Co. v. Cumberland County,* 245 N.C. 492, 96 S.E.2d 341 (N.C.1957).

**5.** In *Ben Lomond* we said in regard to this point:

Taxation of interests in real property is determined by local statutes, in this case by Fairbanks North Star Borough ordinances. Lomond argues that, if it does have an in-terest in the Cool Homes Project, its interest is not a real property interest and therefore cannot be taxed as real property. The applicable ordinance, FNSB Ord. 3.08.010(D), provides otherwise:

D. "Real property" includes:

1. Land and all buildings, structures, improvements, and fixtures thereon, and appurtenances thereto;

. . . .

3. Leases and possessory interests in the above.

The "buildings, structures, [and] improvements" built on the leased land fit squarely within section (D)(1); Lomond's leasehold of the land falls under (D)(3).

760 P.2d at 513.

**6.** Alaska Statute 29.45.110(a) reads:

The assessor shall assess property at its full and true value as of January 1 of the assessment year, except as provided in this section,

ties are to be accorded broad discretion in deciding among recognized valuation methods.[7] We have explained the scope of this discretion in a municipal tax case as follows:

> The City was not bound by any particular formula, rule, or method, either by statute or otherwise. Its choice of one recognized method of valuation over another was simply the exercise of a discretion committed to it by law. Whether or not it exercised a wise judgment is not our concern. This court has nothing to do with complaints of that nature. It will not substitute its judgment for the judgment of those upon whom the law confers the authority and duty to assess and levy taxes. *This court is concerned with nothing less than fraud or the clear adoption of a fundamentally wrong principle of valuation.*

*Twentieth Century Inv. Co. v. City of Juneau,* 359 P.2d 783, 788 (Alaska 1961) (footnotes omitted and emphasis added).

North Star's expert, Timothy Lowe, stated before the Board during the administrative appeal in this case that the method used by the Board was one of two "primary methods for ... estimating value of the leasehold or partial interest." He further explained that the method used by the Borough "is typically only used in the valuation of leasehold interests on tax-exempt property." Thus, the uncontroverted evidence in the record supports the conclusion that North Star's leasehold interest, which

is located on federal, tax-exempt property, was valued by a recognized method.

North Star argues that the reversionary method is a fundamentally wrong technique for valuing its leasehold interest in the Fort Wainwright land. Using this method, the Borough valued North Star's leasehold interest in the leased and leased-back land at $2,814,754. North Star argues that the proper approach would have been for the Borough to value the leasehold interest at zero dollars ($0) under the rent savings method.

A member of the Borough Assessing Staff testified before the Board of Equalization that the leasehold valuation was based on the land's market value, as if it were owned by North Star, minus an adjustment based on the fact that North Star's interest in the land is only for a term of 32 years. The record also shows that the Assessing Staff compared the 76–acre Fort Wainwright parcel to three other local parcels of 196 acres, 34.98 acres, and 40 acres, respectively.[8] Based on comparison, the Borough valued the land at $1/sq. ft., and determined that the full parcel would sell for $3,311,475 in fee simple. After discounting this figure by 4.7% to account for the fact that the land would revert back to Fort Wainwright after 32 years, and by 10% to account for use restrictions on the land,[9] the valuation was reduced to $2,814,-754.

---

AS 29.45.060, and 29.45.230. The full and true value is the estimated price that the property would bring in an open market and under the then prevailing market conditions in a sale between a willing seller and a willing buyer both conversant with the property and with prevailing general price levels.

Fairbanks North Star Borough Ordinance No. 3.08.029 reads the same, except for a deletion of the words "this section."

7. Where an agency decision as to "questions of fact and law involve[s] agency expertise," this court will affirm that decision if there is a "reasonable basis" for it. *Alaska Survival v. State, Dep't of Natural Resources,* 723 P.2d 1281, 1285–86 (Alaska 1986). If there is a reasonable basis for the taxing method used by an agency, that method will be allowed "so long as there [is] no fraud or 'clear adoption of a fundamen-

tally wrong principle of valuation.'" *Hoblit v. Greater Anchorage Area Borough,* 473 P.2d 630, 632 (Alaska 1970) (quoting *Twentieth Century Inv. Co. v. City of Juneau,* 359 P.2d 783, 788 (Alaska 1961)).

8. The 196–acre parcel, located two miles west of Fort Wainwright, sold at $0.67/sq. ft., but was rated as having a poorer "location" and "access" than the land leased by North Star. The 34.98–acre parcel, located adjacent to Fort Wainwright, sold at $0.95/sq. ft., but was rated as having poorer access and soil. The 40–acre parcel, located two miles south of Fort Wainwright, sold at $0.80/sq. ft., but was rated as having a poorer location. Otherwise these parcels were rated as being "similar" to the Fort Wainwright parcel.

9. *See supra* note 3.

North Star does not challenge these calculations, the discount rates used by the Borough, or the comparison study. Rather, it claims generally that the Borough's method of valuing the land "bears no meaningful relationship to the fair market value of the property being valued," and is therefore invalid under state law and the borough tax ordinance. North Star also states that the Borough failed to offer testimony referring to "comparable sales." However, the record shows that the Assessing Staff did in fact show that the value of the Fort Wainwright land was ascertained through comparison.

Additionally, North Star argues that the inaccuracy of the Borough's valuation method is demonstrated by expert testimony that the leasehold interest in the Fort Wainwright land has no value. We disagree. North Star is entitled to use the land rent-free for a period of 19½ years. The free-rental period may be extended upon the expiration of the 19½-year "Agreement to Lease." This free use of land, which enabled North Star to build 400 rental units which it leases to the Government for $7,730,920 per year, must have at least some value to North Star.

We reject North Star's general challenge that the valuation figure bears no relation to the land's fair market value. Based on the record before us, we cannot conclude that the valuation method used by the Board is "fundamentally wrong." Rather, it appears that the valuation substantially complies with the state and borough requirements that land be assessed according to its fair market value. This is evidenced by the comparison study conducted by the Borough, which provides a substantial basis for the arrived at valuation. That the property's fee value provides a basis for determining its leasehold value in this case is evidenced by the fact that North Star is given use of the land rent-free and utility cost-free for at least 19½ years, and likely

longer.[10] Thus, the leasehold interest in this case shares attributes of a fee interest. Furthermore, while one might question whether the 4.7% discount rate applied by the Borough fully reflects the difference in value between this land as a leasehold, as opposed to a fee interest, no such argument is made by North Star. Nor was any evidence on this point presented below. Rather, North Star's only mention of the 4.7% discount rate is that it should be applied to the Borough's valuation of the rental units, which will allegedly "revert" to the government at the end of the 32-year outlease.

North Star also argues that the valuation method it prefers has been recognized as proper in both valuing leasehold interests and for condemnation purposes. However, this in no way detracts from the fact that the Borough has the discretion to choose from a variety of methods, as long as they are not "fundamentally wrong." Furthermore, North Star presents no evidence that the Borough "fraudulently" uses the reversionary method to produce high taxing valuations, while using the rent-savings method to produce low condemnation valuations.

We therefore affirm the superior court's decision to uphold the Borough's method for valuing North Star's leasehold interest in the Fort Wainwright land.

V. SHOULD THE VALUE ATTRIBUTED TO NORTH STAR'S STRUCTURAL IMPROVEMENTS ON THE LAND HAVE BEEN REDUCED BASED ON THE FACT THAT THE ECONOMIC LIFE OF THE RENTAL UNITS MAY EXPIRE AT THE END OF THE 32-YEAR OUTLEASE?

■ The United States Government agreed to lease North Star's buildings for a 19½-year term. North Star and its expert, Timothy Lowe, admit that it is anticipated that this lease will be renewed at the end of that term, until at least the expiration of

**10.** The outlease provides that North Star will not have to pay the Government any rent for using the Fort Wainwright land as long as it leases its units as military housing through a lease with the Government. Such a lease (the Agreement to Lease) has been entered into for a

19½-year period. North Star's expert admits that this agreement will likely be continued at the expiration of the 19½-year term. Use of the land will remain rent-free, though the rental amount paid to North Star by the Government may be "recast."

the 32–year outlease. The outlease entitles North Star to continue to lease its Fort Wainwright apartments even if the Government does not renew its tenancy after the 19½–year term. North Star asks this court to require the Board to reduce its $3.6 million valuation of the structural improvements by 4.7% to reflect the Government's "reversionary" interest in the property after the 32–year outlease term.

The Borough has already discounted North Star's lease-hold interest by 4.7% to reflect the fact that the Government retains a reversionary interest in that property after 32 years. However, the Borough argues that no corresponding discount should be applied to the valuation of North Star's rental units since they will not actually revert to the Government after the expiration of the outlease. Rather, at the end of the 32–year outlease term, or at any time prior to that, North Star has a right to sell the structures, which it alone owns, to any third party. The Government is only granted a right of first refusal. If North Star is unable to sell its structures to either a third party or the Government, and if the rental agreement between the Government and North Star is not extended after 32 years, the Government will still have no property interest in the structures.

North Star notes, on the other hand, that even though it will retain technical title to the structures, it will be required to demolish or remove its structures within six months after the term's expiration. It is argued that since this may not be feasible, the structures may just be left behind at the end of the outlease term for the Government's benefit. Thus, the Government will "then, effectively, [have] a reversionary interest."

It is apparent that the Government has no legally enforceable "reversionary" interest in the buildings similar to the reversionary interest it holds in the land. The buildings, unlike the land, are owned by North Star, and the Government does not have the right to take possession of them without North Star's consent. However, there exists at least a possibility that North Star's structures will be worthless at the end of the outlease term. The Board's valuation should take this factor into account.

The Borough does not assert that any effort was made to arrive at an appropriate discount. The Borough merely decided not to adjust downwards its valuation of the 400 housing units. Review of the record fails to disclose a reasonable basis for this decision. We therefore conclude that this aspect of the case must be remanded in order to afford the Borough the opportunity to determine an appropriate discount rate, or to substantiate its decision to value the 400 housing units as if they will be utilized for their full structural life.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.